Gants, J.
The plaintiffs, Christine Cronin, Robert Roe, Nury Nieves, and John Christian, filed suit on April 24, 2000 claiming that a rule issued by the Executive Office of Health and Human Services (“EOHHS”) known as Procedure No. 001 was issued in violation of the Massachusetts Administrative Procedure Act, G.L.c. 30A, §§1, 3, 5, and 6, deprived them of liberty and property without due process of law, and violated their right to equal protection and substantive due process. The plaintiffs now move for partial summary judgment as to these claims.
The motion for partial summary judgment appears to seek a resolution of all claims, but it is “partial” because the complaint was brought as a putative class action and the plaintiffs have not yet sought certification of the class. Rather, the plaintiffs have chosen to seek summary judgment only on behalf of the named plaintiffs, not the putative class, assuming that, if they were to prevail, EOHHS would comply with the law set forth by the Court and render moot the need for a class action. See Doe v. Registrar of Motor Vehicles, 26 Mass.App.Ct. 415, 425 n. 18 (1988). Consequently, for all practical purposes, this motion is brought simply by four individual plaintiffs, albeit with possible repercussions to other members of the putative class.
BACKGROUND
The facts of this case have proven to be a moving target since this motion was filed. At the time this motion was filed, Procedure No. 001 was in effect simply as EOHHS’s written standardized policy on criminal background checks, issued by then-EOHHS Secretary Gerald Whitburn on May 14, 1996, effective on May 20, 1996. It had not been promulgated as a regulation under G.L.c. 30A, and therefore did not satisfy the requirements set forth under G.L.c. 30A before a regulation may become final and take effect. However, by December 29, 2000, all but one of the agencies that comprise EOHHS had filed with the Secretary of State’s office emergency regulations intended to replace Procedure No. 001; the only EOHHS agency that did not file emergency regulations — the Division of Health Care Finance and Policy — has no need for such regulations because it neither has contact with human service clients nor contracts with vendors who have such contact. The plaintiffs concede that “the issuance of the regulations grants plaintiffs the relief they sought on their Administrative Procedure Act claim, and that the Court therefore need not rule on that claim.” Plaintiffs’ Reply to Defendant’s Supplemental Opposition to Plaintiffs’ Motion for Partial Summary Judgment at 2. That leaves the constitutional claims.
In considering the constitutional claims, it is important first to examine the now-defunct Procedure No. 001 and the emergency regulations that replaced them. Under Procedure No. 001, any person under consideration for hire or as a volunteer to provide services to any state agency within EOHHS must disclose on the application form whether he or she has a criminal record and the applicant must undergo a check for criminal offender record information (known as a "CORI” check) with the Criminal History Systems Board.[2] There were three categories of disqualification established under Procedure No. 001:
1. Those convicted of certain crimes, mostly crimes involving violence, sexual assault, or drug trafficking, were mandatorily disqualified from being hired for their entire lifetime;
2. Those convicted of other, generally less serious crimes were mandatorily disqualified from being hired for ten years after their date of release from any form of custody, whether that be prison, probation, or parole; and
3. Those convicted of other, still less serious crimes could be hired, but only with the written authorization of the Hiring Authority based on clear and convincing evidence of the applicant’s fitness for employment.
Under Procedure No. 001, two of the plaintiffs— Christine Cronin and Nury Nieves — were disqualified from employment with any EOHHS agency until 2006 and 2009 respectively as a result of prior narcotics *406 convictions that were among those in the ten-year mandatory disqualification category. The other two plaintiffs — Robert Roe and John Christian — as a result of a manslaughter and armed robbery conviction, respectively, were disqualified for life.
The new emergency regulations differ in at least two significant ways from Procedure No. 001. First, while Procedure No. 001 according to its terms mandatorily disqualified those in the first two categories from all paid employment in any EOHHS agency, the new regulations limited the disqualifications to those positions “where there is potential unsupervised contact with program clients.” See, e.g., 105 C.M.R. §950.105(1) (regarding the Department of Public Health, an EOHHS agency). “Potential unsupervised contact” is defined in the new regulations as “(a) reasonable likelihood of contact with a person who is receiving or applying for [EOHHS services] when no other CORI cleared employee is present." 105 C.M.R. §950.005. “A person having only the potential for incidental unsupervised contact with clients in commonly used areas such as elevators, hallways and waiting rooms shall not be considered to have the potential for unsupervised contact for purposes of the regulations.” Id. However, a person who has the potential for contact with clients in bathrooms and other isolated areas that are accessible to clients shall be considered to have the potential for unsupervised contact. Id. Therefore, even for those still mandatorily disqualified, the scope of positions for which the applicant is disqualified is somewhat narrowed.[3]
Second, the new regulations realign the list of convictions into four categories, of which only one category mandates disqualification:
1. Convictions for certain crimes of violence, sexual assault, and drug trafficking, including the crimes of manslaughter and armed robbery of which plaintiffs Roe and Christian had been convicted, continue to carry lifetime mandatory disqualification.
2. Convictions for serious, but lesser, crimes carry a ten-year “presumptive disqualification,” meaning that, for ten years from the date of release from all custody (including probation and parole), the individual is barred from employment with any EOHHS agency or vendor in any position where there is the potential for unsupervised contact with agency clients unless either (a) the applicant’s probation officer, parole officer, or another criminal justice official concludes in writing that the applicant is appropriate for the position and does not pose an unacceptable risk to the persons served by the program or (b) where these persons are unavailable or have too little information to provide an assessment, a designated forensic psychiatrist or psychologist has made an assessment of the applicant and concluded in writing that the applicant is appropriate for the position and does not pose an unacceptable risk to the persons served by the program. If such assessments are received, then the disqualification is no longer mandatory but discretionary with the hiring official. 105 C.M.R. §950.005.
3. Convictions for still lesser crimes, some of which were under the discretionary disqualification category under Procedure No. 001, carry a five-year “presumptive disqualification” that is identical to the ten-year “presumptive disqualification” in everything but its duration. Id.
4. Convictions for the least serious crimes are under the discretionary disqualification category, meaning that they may result in disqualification from the position in the discretion of the hiring official. Id.
Under the new regulations, plaintiffs Cronin and Nieves are now subject to presumptive disqualification, not mandatory disqualification. As a result, these two plaintiffs now ask this Court not to decide this summary judgment motion as to them, since it is not yet clear how the methods for rebutting the presumptive disqualification will be applied. This Court agrees that, in view of the absence of an amended complaint and a more developed record, the constitutionality of the presumptive disqualification provisions is not ripe for decision.
That leaves the constitutional claims of Roe and Christian as to the mandatory lifetime disqualifications in Procedure No. 001 that have been continued in the emergency regulations. This Court concludes, based on the affidavits of Roe and Christian that demonstrate that they are seeking employment in EOHHS human service positions for which they are mandatorily barred for the remainder of their lives, that they have legal standing to bring this action and that their constitutional claims are ripe for decision. As a result, this Court shall examine their constitutional claims alleging that their lifetime mandatory disqualification is in violation of procedural due process. If that determination is not dispositive of the case, the Court will examine whether the lifetime bar violates the equal protection clause or substantive due process.
DISCUSSION
Procedural Due Process
1. Do Roe and Christian Have a Constitutionally Protected Liberty or Property Interest?
For the mandatory lifetime disqualification in Procedure No. 001 and the new regulations to violate procedural due process, Roe and Christian must first demonstrate that they have a constitutionally protected liberty or property interest that EOHHS is depriving them of without due process. With respect to a possible property interest, it is plain that neither Roe nor Christian have any entitlement to a job with EOHHS or its vendors. Without such an entitlement, they cannot have a constitutionally-protected property interest in such employment. Board of Regents v. Roth, 408 U.S. 564, 577 (1972). As the United States *407 Supreme Court declared, “To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.” Id.
However, the absence of a property interest in employment does not necessarily mean that Roe and Christian have not been deprived of a liberty interest. See, e.g., Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d 953, 962 (D.C.Cir. 1980). In Board of Regents v. Roth, the Supreme Court recognized that the “liberty” guaranteed by the Fourteenth Amendment “denotes not merely freedom from bodily restraint but also the right of the individual to contract [and] to engage in any of the common occupations of life . . .” 408 U.S. at 572, quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923). The denial of employment, in the absence of an entitlement to such employment, standing alone, is not sufficient to constitute a liberty interest. Board of Regents v. Roth, 408 U.S. at 572-73. Nor is stigma derived from defamation by the government, standing alone, sufficient to constitute a liberty interest. Paul v. Davis, 424 U.S. 693, 701 (1976); Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d at 965. When, however, there is:
1. the deprivation of a tangible interest, such as employment, and
2. stigma resulting from the denial of such employment based on the applicant’s purported dishonesty, immorality, or propensity for future criminality, and
3. the applicant is foreclosed, not merely from a single position, but from a significant number of employment opportunities in his field,
the combination of these three elements rises to the level of a deprivation of a constitutional liberty interest. See Board of Regents v. Roth, 408 U.S. at 572-74; Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d at 964-66.
These three elements are all present with respect to the mandatory lifetime disqualification imposed earlier by Procedure No. 001 and now by the EOHHS regulations. The regulations explicitly provide that the reason for the mandatory disqualification is “due to the unacceptable risk posed by the nature of the crime to persons receiving services.” 105 C.M.R. §950.005. Quite plainly, EOHHS is stating that it is barring Roe and Christian (and all others convicted of the listed crimes) from any EOHHS position in which they potentially may have unsupervised contact with persons receiving services because they pose an unacceptable risk of doing harm to those persons.[4] The consequence of this conclusive presumption of “unacceptable risk” is not simply denial of a single position; it bars them from every position with an EOHHS agency or a service provider funded by EOHHS in which there is a risk that they maybe left alone with an agency client, even for a minute, even in the bathroom. For Roe, who has a masters degree in social work, and Christian, who is certified as an alcoholism and drug abuse counselor, this mandatory disqualification effectively bars them from thousands of social service jobs and significantly impairs their ability to pursue their careers in social work and counseling. See Connecticut v. Gabbert, 526 U.S. 286, 291-92 (1999); Hampton v. Mow Sun Wong, 426 U.S. 88, 102 & n. 23 (1976).
The existence of a liberty interest under these circumstances can perhaps most clearly be seen if one recognizes that the mandatory lifetime disqualification under the EOHHS regulations for those convicted of certain crimes constitutes a lifetime mandatory debarment. Corporations doing business with the federal government have for years been subject to various forms of debarment when they have engaged in wrongdoing, and it is established that debarment from federal procurement deprives a corporation of a liberty interest. See, e.g., Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d at 964-66; Transco Sec., Inc. of Ohio v. Freeman, 639 F.2d 318, 321 (6th Cir. 1981); Reeve Aleutian Airways, Inc. v. United States, 982 F.2d 594, 598-99 (D.C.Cir. 1993). In the seminal case of Old Dominion Dairy Products, Inc. v. Secretary of Defense, Old Dominion was denied two government contracts for which it was the low bidder because it had been debarred from federal defense contracting as a result of a finding that it lacked integrity as a company. Id. at 957-59. Old Dominion had no greater entitlement to these government defense contracts than Roe and Christian had to EOHHS employment, but the District of Columbia Circuit found that it had been deprived of a liberty interest because it lost two substantial contracts it otherwise would have received, was denied these contracts expressly because it was deemed to lack integrity, and, as a result of the debarment, was also foreclosed from other contractual opportunities. Id. at 962-65. If a corporation has a liberty interest in contractual opportunities lost as a result of debarment by a federal procurement agency, then individuals certainly have a liberty interest in employment opportunities lost as a result of debarment by a state human services agency.
2. What Process is Due?
The existence of a constitutionally protected liberty interest means that some process is due before the government may deprive that person of that interest. In Mathews v. Eldridge, 424 U.S. 319 (1976), the United States Supreme Court declared that the determination of how much process is due requires consideration of three factors:
First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, *408 the Government’s interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
Id. at 335. The Mathews Court noted, however, that “due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.” Id. at 334, quoting Cafeteria Workers v. McElroy, 367 U.S. 886, 895 (1961). To the contrary, the Court stated that “[d]ue process is flexible and calls for such procedural protections as the particular situation demands.” Mathews v. Eldridge, 424 U.S. at 334, quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972). See generally Roe v. Attorney General, 434 Mass. 418, 427 (2001). These procedural protections generally include notice of the charges giving rise to the debarment, an opportunity to rebut those charges, and, under most circumstances, a hearing. Transco Sec. Inc. of Ohio, 639 F.2d at 321.
In determining what process is due, this Court must look to the due process analysis conducted by the Supreme Judicial Court with respect to the registration of sex offenders. Under G.L.c. 6, §178E, every person convicted of designated sex offenses was required to register in person at their local police station. Roe v. Attorney General, 434 Mass. at 421. A board was created to assess each sex offender’s level of dangerousness and risk of sexual recidivism, and assign each offender to one of three risk categories— level one (low), level two (moderate), and level three (high). Id. If a sex offender were assigned to level one, the police maintained a record of his registration which was available for review by anyone age 18 or over. Id. If a sex offender were assigned to level two or three, not only did the police maintain a record of registration that was available for public review, but the police had to institute a community notification plan to warn designated persons and entities of the sex offender’s residence in their community. Id. at 421-22.
In Doe v. Attorney General ("Doe No. 3”), the Supreme Judicial Court found that even a level one offender "has sufficient liberty and privacy interests constitutionally protected by art. 12 [of the Massachusetts Declaration of Rights] that he is entitled to procedural due process before he may be required to register and before information may properly be publicly disclosed about him.”[5] 426 Mass. 136, 143 (1997). In determining what process was due, the Attorney General argued that, at most, all that was required was a hearing to ascertain that the individual fell within the legislative classification, that is, that he was indeed the same person convicted of the qualifying sex offense. Id. at 144. The Supreme Judicial Court rejected that formulation, and required that the hearing determine not simply whether the individual had been convicted of a sex offense but whether he “is a threat to those persons for whose protection the Legislature adopted the sex offender act.” Id. at 144-45. Even though the Legislature had mandated that all persons convicted of qualifying sex offenses register with the police, implicitly enacting legislatively a conclusive presumption that all persons convicted of these crimes pose a threat to the public because of their risk of re-offending, the Supreme Judicial Court held that due process meant rejecting that conclusive presumption and giving the sex offender the opportunity to rebut at a hearing any presumption that he constitutes a threat to the public. See id. at 144-46. The Court declared, “There is . . . nothing inherent in the crime of indecent assault and battery, or in the circumstances (on the record before us) of the plaintiff, that indicates that either a person convicted of that crime, or the plaintiff himself, is a threat to those persons for whose protection the Legislature adopted the sex offender act.” Id. at 144-45. The Court continued, "(I]t is contrary to the principle of fundamental fairness that underliés the concept of due process of law to deny the plaintiff a hearing at which the evidence might show that he is not a threat to children and other vulnerable persons whom the act seeks to protect and that disclosure is not needed when balanced against the public need to which the sex offender act responded.” Id. at 146.[6]
In the next Doe case, Doe v. Attorney General (“Doe No. 4”), the Attorney General argued that the conclusive legislative presumption of dangerousness, while perhaps not appropriate for all sex offenders, is certainly appropriate for a sex offender adjudicated delinquent of the crime of rape of a child, in violation of G.L.c. 265, §23. 430 Mass. 155, 163-64 (1999). The Supreme Judicial Court also rejected this contention, stating, “Because we can envision situations, some of which we have suggested, where the risk of reoffense by one convicted under G.L.c. 265, §23, maybe minimal and the present danger of that person to children not significant, the general legislative category does not adequately specify offenders by risk so as to warrant automatic registration of every person convicted under that statute.” Id. at 164-65. In essence, even those convicted of rape of a child are entitled to a hearing to rebut the presumption that they pose a present danger to children before they must register as a sex offender. See id.
The Supreme Judicial Court recognized the possibility that a conclusive presumption may be justifiable in situations “where the danger to be prevented is grave, and the risk of reoffense great,” such as with “those convicted of repeated crimes of violence against young children.” Id. at 165. See also Roe v. Attorney General, 434 Mass. at 423. However, the Court noted, “[B]ecause the deprivation of protected liberty interests in those cases will occur without an opportunity to be heard, the burden will be on the sex offender registry board to demonstrate, through appropriately promulgated regulations, that the offender is in a category that poses a grave threat to children and *409 other vulnerable populations and that the risk of reoffense in those circumstances is compelling.” Doe No. 4 at 165. Indeed, even if the sex offender registry board empirically could demonstrate that certain carefully-defined categories of convicted sex offenders posed a high risk of sexual recidivism, the Court recognized that there still may not be a conclusive presumption of dangerousness for persons within these categories because “due process may require some opportunity to show that for some reason — a long passage of time without reoffense, for example— the offender should be exempted from some or all of the regulations.” Id. at 165 n. 18.
Since, as the Supreme Judicial Court has declared in Doe No. 3 and Doe No. 4, procedural due process forbids, in all but the most limited circumstances, a mandatory conclusive presumption that a convicted sex offender poses so substantial a threat to the public as to warrant his registration with the police, and since procedural due process requires that convicted sex offenders be given the opportunity to rebut the inference that they pose a threat to the public, then procedural due process under Article 12 of the Massachusetts Declaration of Rights must also forbid, in all but the most limited circumstances, a mandatory conclusive lifetime presumption that a person convicted of certain serious crimes poses an “unacceptable risk” to persons receiving social services. With both sex offender registration and debarment from EOHHS social service employment, the Commonwealth of Massachusetts sought to deprive an individual of a liberty interest based solely on his prior conviction, relying on the conclusive presumption that his prior conviction meant that he posed a danger to others. If the Commonwealth cannot require a convicted sex offender to register with his local police department without giving him the opportunity to rebut the inference that he poses a danger to the public, then the Commonwealth also cannot bar a convicted criminal from EOHHS social service employment without giving him the opportunity to rebut the inference that he poses a danger to persons receiving or applying for EOHHS services. Cf. In the Matter of an Application for Admission to the Bar of the Commonwealth, 431 Mass. 678, 681 (2000) (prior conviction is not an absolute bar to admission to the Bar; “No offense is so grave as to preclude a showing of present moral fitness"), quoting Matter of Prager, 422 Mass. 86, 91 (1996); and Matter of Allen, 400 Mass. 417, 421-22 (1987).
Even if EOHHS “could, consistent with due process, promulgate narrowly tailored regulations to identify categories of offenders who posed a grave danger and high risk of reoffense,” for whom individual hearings “might not be necessary,” Roe v. Attorney General, 434 Mass. at 423, EOHHS’s recent emergency regulations do not meet these criteria. Nor is it apparent that individuals convicted of the crimes for which Roe and Christian were convicted — manslaughter and armed robbery respectively — pose so grave a danger and so high a risk of reoffense as to warrant a lifetime mandatory conclusive presumption of dangerousness.[7] Even if persons convicted of these crimes empirically could be shown to pose an unacceptable risk of future danger, it is not apparent that this risk would endure for their entire lifetime.
It is important to recognize that procedural due process under Article 12 of the Massachusetts Declaration of Rights does not prevent EOHHS from rejecting a job applicant because of a prior criminal conviction. Rather, it simply means that EOHHS must provide the applicant with a fair opportunity to rebut the inference that, because of his prior criminal conviction, he poses an “unacceptable risk” to those receiving social services from EOHHS.
Therefore, this Court allows the motion for partial summary judgment brought by plaintiff Roe and Christian to the extent that this Court declares that Procedure No. 001 and the EOHHS emergency regulations violate procedural due process under Article 12 of the Massachusetts Declaration of Rights in that they impose a lifetime mandatory conclusive presumption that Roe and Christian, because of their prior convictions, pose an unacceptable risk to those applying for and receiving social services from EOHHS.[8] Roe and Christian, as a matter of procedural due process, are entitled to a fair opportunity to rebut the inference that, because of their prior convictions, they pose an unacceptable risk to EOHHS clients. Roe and Christian shall be given that fair opportunity by EOHHS no later than October 12, 2001.[9]
ORDER
For the reasons stated above, the plaintiffs Roe’s and Christian’s motion for partial summary judgment is ALLOWED to the extent that:
1. This Court declares that Procedure No. 001 and the EOHHS emergency regulations violate procedural due process under Article 12 of the Massachusetts Declaration of Rights to the extent that they impose a lifetime mandatory conclusive presumption that Roe and Christian, because of their prior convictions, pose an unacceptable risk to those applying for and receiving social services from EOHHS. Roe and Christian, as a matter of procedural due process, are entitled to a fair opportunity to rebut the inference that, because of their prior convictions, they pose an unacceptable risk to EOHHS clients.
2. Roe and Christian shall be given that fair opportunity by EOHHS no later than October 12, 2001.

 Procedure No. 001, on its face, also covered candidates for “positions funded by grants . . . and vendor agency positions," but EOHHS conceded that the Procedure had no legal effect on the hiring of employees by human service providers *410 which contract with EOHHS agencies unless specifically Included In the provider contract.

 Under Procedure No. 001, “potential unsupervised contact with persons receiving services” was defined as “Contact with a person who is receiving or applying for EOHHS agency services when no other supervisory staff person is present. A person who has access to areas where clients may be unsupervised, such as elevators, bathrooms, and waiting rooms, shall be considered to have the potential for unsupervised contact." Under the language of Procedure No. 001, the mandatory disqualification for paid EOHHS employees was not limited to those positions with “potential unsupervised contact with persons receiving services”; only the disqualification for volunteers was limited to those positions with the potential for unsupervised contact. However, from information in the record, it appears that, in practice, EOHHS did not disqualify applicants with prior convictions from paid positions unless the applicant had the potential in that position for unsupervised contact with agency clients. If this was indeed the practice, then the regulations still narrowed the scope of the disqualification but only through its slightly narrower definition of “potential unsupervised contact with persons receiving services.”

 EOHHS contends that there can be stigma only if it publicly disseminates the fact of disqualification. This Court finds that there need not be a public declaration for there to be stigma. Here, the regulation itself declares that persons, like Roe and Christian, with certain prior convictions pose an unacceptable risk of doing harm to agency clients. In other words, the regulation declares that Roe and Christian are too dangerous to be trusted alone with persons receiving human services. The stigma that arises from such a declaration shall be known throughout EOHHS and the service providers who contract with EOHHS, which for all practical purposes constitutes the vast majority of the human service provider community in Massachusetts. See Larry v. Lawler, 605 F.2d 954, 958 (7th Cir. 1978) (“In effect, Larry has been stigmatized throughout the entire federal government. He is deprived of the opportunity to work in any capacity for any branch of the government”), quoted in Old Dominion Dairy Products, Inc. v. Secretary of Defense, 631 F.2d at 966 n. 24.

 The Supreme Judicial Court expressly rested its decision regarding the requirements of procedural due process on the Massachusetts Constitution, and left open whether such a result would also be dictated by the due process clause of the Fourteenth Amendment to the United States Constitution. Doe No. 3, 426 Mass. at 144 & n. 8; Doe v. Attorney General, 430 Mass. 155, 163 (1999) (“Doe No. 4”).

 It is important to emphasize that the Supreme Judicial Court held that the right of a sex offender to a hearing focused on present dangerousness rather than simply proof of the earlier conviction derives from procedural due process, not equal protection. Doe No. 3 at 140-46. Indeed, the plaintiff in Doe No. 3 did not even argue that registration violated the equal protection clause. Specifically, the plaintiff did not contend that, either facially or as applied to him, there was no rational relation between his conviction and the registration requirement. Id. at 140-41.

 Moses was guilty of manslaughter for the killing of one of Pharoah’s taskmasters (although he was never tried or convicted), but I doubt that EOHHS would contend that, as a result of his prior criminal conduct, he posed an “unacceptable risk” to the Israelites he led out of Egypt.

 In view of this result, this Court need not decide whether Procedure No. 001 or the emergency regulations violate the equal protection clause or substantive due process.

 This Court will permit EOHHS to determine precisely how, consistent with procedural due process, it will give Roe and Christian a fair opportunity to rebut the inference that they pose an unacceptable risk to EOHHS clients. Of course, Roe and Christian retain the right to challenge before this Court whether the opportunity they are given satisfies the dictates of procedural due process.